Revised November 13, 2001

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 00-20255
_____

VERONICA A. WALLACE,

Plaintiff - Appellant,

versus

THE METHODIST HOSPITAL SYSTEM,

Defendant - Appellee.

Appeal from the United States District Court
for the Southern District of Texas

November 7, 2001

Before EMILIO M. GARZA and PARKER, Circuit Judges, and HINOJOSA[*], District Judge.

EMILIO M. GARZA, Circuit Judge:

Veronica A. Wallace ("Wallace") appeals the district court's grant of judgment as a matter

of law to the defendant, The Methodist Hospital System ("Methodist"), on her Title VII[1] and Texas

---

[*]    District Judge of the Southern District of Texas, sitting by designation.

[1]    42 U.S.C. § 2000e *et seq.*

Commission on Human Rights Act (TCHRA)[2] claims of sex discrimination. We affirm.

**I**

Wallace began working at Methodist in 1986 as a technician, but in 1990, she entered nursing school.[3] While she was in nursing school, Donna Hahus ("Hahus"), the head nurse of Methodist's Medical Intensive Care Unit (MICU), hired Wallace as a student nurse. In the fall of 1992, soon after Wallace completed her nursing degree and became a Registered Nurse, Hahus hired Wallace as a staff nurse in the MICU. At the time she was hired, Wallace was pregnant with her first child. During the spring of 1993, Wallace took three-and-a-half months' maternity leave. By using accrued sick time, holiday time, and vacation time, Wallace received full pay and benefits throughout this leave.

Wallace returned to work in June. Shortly after returning to work, Wallace discovered that she was pregnant with her second child. Wallace switched her schedule from days to nights and began working a compressed schedule, putting in three twelve-hour shifts each week instead of five eight-hour shifts. Wallace testified that on her return, Hahus treated her differently. Specifically, when Hahus came on her shift and Wallace was finishing her shift, Hahus did not converse with Wallace when she entered a room to check a patient's chart. However, Martine Rousseau-Merzile, a nurse who was not pregnant during her employ in the MICU, testified that this was how Hahus treated her, i.e., she would just go about her business looking at the charts without speaking.

Just before Wallace left on her second maternity leave, Hahus and Tory Schmitz ("Schmitz"), Wallace's direct supervisor, met with Wallace to give her an evaluation. Wallace received a

---

[2]     Tex. Labor Code Ann. § 21.051 *et seq.*

[3]     Our recitation of the facts reflects the lens through which we view the evidence on a motion for a judgment as a matter of law, namely, in the light most favorable to the nonmovant. *See* Section II.A. *infra*.

satisfactory rating and a merit increase as a result of this appraisal. Nonetheless, the evaluation contained written comments criticizing Wallace for "an impression that she is unconcerned with errors and omissions" and her overall score dropped ten points from the previous year when she was also pregnant. The evaluation noted that Wallace had been working the compressed schedule since returning from maternity leave. During this meeting, Hahus remarked to Wallace that she needed to "choose between nursing and family." Additionally, Schmitz told Wallace that she was unsure "how to classify [Wallace] because [she was] gone three months before and [she would be] gone three months again."

From March 2, 1994 through June 4, 1994, Wallace took her second maternity leave. Unlike her first maternity leave, Wallace had little accumulated time on which to draw, leaving a portion of her leave unpaid. With Hahus's assistance, however, Wallace increased the paid portion of her leave. Hahus listed enough days of Wallace's leave as excused absences to allow Wallace to accrue an additional four weeks of paid vacation time, which Wallace applied to her leave.

Within a month of returning to work after her second leave, Wallace learned that she was pregnant with her third child. Wallace testified that Hahus mentioned the availability of the compressed schedule to a group of nurses. Wallace stated her preference for this schedule. Hahus retorted that Wallace was "still costing the hospital money because [she] was receiving full benefits and giving 80 hour pay periods." Hahus, however, had no control over whether nurses worked a compressed schedule because it was part of a program Methodist offered to its employees. Wallace resumed working a compressed schedule.

Sometime prior to when she was slated to take her third maternity leave, Hahus chastised Wallace for following a physician's order literally, exclaiming "How stupid could you be?" A

physician had issued an order to draw blood to ascertain the digoxin level of a patient to whom Wallace had just administered digoxin. Wallace knew that drawing the blood so close in time to the drug's administration would result in a false high and so she attempted to locate the physician giving the order. Learning that he had already left for the day, Wallace drew the blood. Hahus received the test results, which she realized registered a false high because of the close proximity of the draw and the administration.

On December 19, 1994, Dr. Barrosa, a gastroenterologist, issued a written order for tube feeding to begin on Mr. B.,[4] a patient in the MICU.[5] Under the order of Mr. B's attending physician, Dr. Kenneth Lloyd, Mr. B already had in place a Salem Sump, a large bore tube used for suctioning fluids from the stomach but which could also be used for tube feeding. Wallace knew that the Salem Sump could be used for feeding. Without an order to do so, even though one was required,[6] Wallace replaced the Salem Sump with a feeding tube of a smaller diameter. She also wrote in the patient's

---

[4]     The patient has been referred to throughout these proceedings as "Mr. B."

[5]     Dr. Barrosa's order stated:

12-19-94 11:00 a.m.

1) Start TF [tube feeding] with FS [full strength] VivinexTen @ 30 millimeters per hour.

2) Check gastric residuals q4h [every 4 hours] - hold TF [tube feeding] X 2H [for 2 hours] if greater than 200 millimeters.
3) Keep bed in reverse Trendelenburg [keep the head up higher than the feet].
4) Okay to transfer to floor from GI standpoint.

[6]     Methodist Policy D-707 provides:

A physician order is required for insertion or removal of a nasogastric tube.

-4-

record that she had received a verbal order from Dr. Nicola Hanania to put in the smaller bore tube.[7]

Dr. Lloyd discovered that the Salem Sump had been replaced. He did not want the Salem Sump removed because of Mr. B's medical problems. After checking the chart and seeing the order with Dr. Hanania's name affixed, Dr. Lloyd asked Dr. Hanania why he had ordered the tube change. Dr. Hanania informed Dr. Lloyd that he had given no such order. Dr. Lloyd then spoke with Wallace. At trial, Wallace admitted that she could have but did not contact a physician about Dr. Barrosa's order.

The next day, Dr. Lloyd told Schmitz about the incident. Schmitz spoke to both Dr. Hanania and Dr. Barrosa, verifying that neither had given an order to change the tube. Dr. Barrosa testified that he did not want the Salem Sump changed. At the direction of Hahus, Schmitz called Wallace at home to inquire about the incident. Wallace admitted to Schmitz that she had inserted the tube without an order and had written that she had received a verbal order without having received one. Additionally, Wallace stated to Schmitz that she "wouldn't do it again." Schmitz related to Hahus what Wallace told her. Hahus verified with Dr. Hanania that he had not given the verbal order as Wallace had written. Hahus also discussed the incident with Marcella Louis, a nursing director and chairman of the peer review committee, Paula Hansen ("Hansen"), another nursing director and Hahus's supervisor, and Dr. Davies, the medical director of Methodist. Hansen, who was not aware

---

[7]     Wallace wrote:

12-19-94 Place feeding tube & check with X-ray. 4p [4:00 p.m.]

VO [verbal order] Dr. Hanania/Veronica Wallace

A verbal order is simply an order given verbally. Pursuant to Methodist Policy D-203, nurses are permitted to transcribe a physician's order.

that Wallace was pregnant, agreed that termination was the appropriate course of action. Hansen then contacted Leslie Wagner ("Wagner") in the Human Resources department. Hansen informed Wagner of the incident, and of Hansen's and Hahus's recommended course of action. Wagner agreed with the decision to terminate Wallace.

On December 21, 1994, Hahus called Wallace and asked her to report to Hahus's office. At that meeting, Hahus informed Wallace that she was terminating her for falsifying a hospital record by writing a verbal order for a specific procedure and then implementing that procedure without a physician's knowledge or consent. Hahus further explained that these actions were "willful or illegal, unprofessional conduct or unethical conduct detrimental to patient care or to [Methodist]'s operations that result in neglect, abuse, or exploitation of any patient,"[8] which constituted a "Class I Violation."[9] At the time of her discharge, Wallace was one month away from taking her third

---

[8] Methodist policy provides that Class I violations include:

G. Willful or illegal, unprofessional conduct or unethical conduct detrimental to patient care or to [Methodist]'s operations that result in neglect, abuse, or exploitation of any patient.

H. Deliberate omission of information, falsification of employee/employer records, or falsifying information to management regarding their availability for work, job duties, or performance.

[9] Methodist Due Process Policy P001 provides:

A CLASS I Violation is defined as a serious violation of System standards under circumstances that, after a thorough consideration of the facts, may justify termination for a first violation without regard to the employee's length of service or prior record of conduct.

Recommended action to be taken is termination for the first violation after review by Employee Relations. See III.H.2.

maternity leave.

Wallace requested an informal grievance meeting as provided by Methodist policy. Wagner, Hahus, Hansen, and Schmitz were present at that meeting. Wallace again admitted that, without receiving a doctor's order, she wrote a verbal order in Mr. B's chart and she replaced the Salem Sump, inserting a smaller bore nasogastric tube. Wallace also admitted that there were physicians available from whom she could have obtained an order prior to writing the order and inserting the feeding tube. In her defense, Wallace contended generally that other nurses engaged in the same actions, but were not terminated. The termination was upheld.

Shortly after Wallace's termination, Pat Gaskin ("Gaskin"), another nurse in the MICU, overheard Shawn Forney, a clinical dietician in the MICU, ask Schmitz why Wallace had been terminated. Schmitz replied, "First of all, she's been pregnant three times in the last three years." Upon hearing Schmitz's reply, Gaskin walked away.

Wallace filed suit against Methodist, alleging that Wallace had been terminated because of her sex, i.e., her pregnancies, in violation of Title VII and the TCHR. In September of 1998, the case went to trial. The jury was unable to reach a verdict and the district court declared a mistrial. The district court held a second trial in December of 1998. At the close of Wallace's case and at the close of all the evidence, Methodist moved for a judgment as a matter of law (JMOL), pursuant to Federal

---

Section III.H.2 of Policy P001 provides:

> Immediate termination. If termination is elected due to the clarity of the issues involved and the severity of the violation, the manager/supervisor must review the facts with Employee Relations before terminating the employee and no later than a workday following a weekend termination to ensure that the action was equitable and consistent with similar cases.

Rule of Civil Procedure 50. Both times the district court denied the motions. The jury returned a verdict for Wallace, awarding her $70,000 in compensatory damages and $437,500 in punitive damages. Methodist again moved for a JMOL. The district court granted the motion and dismissed the case with prejudice. Wallace filed a timely notice of appeal.

## II

### A

We review the district court's grant of JMOL de novo. *See Ins. Co. of N. Am. v. Aberdeen Ins. Servs.*, 253 F.3d 878, 883 (5th Cir. 2001). JMOL is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). There is no legally sufficient evidentiary basis when "'the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict.'" *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc)). We are to review the record as a whole, drawing all reasonable inferences in favor of the nonmoving party and without making credibility determinations or weighing the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000). We also "give credence to . . . that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *See id.* at 151, 120 S. Ct. at 2110 (quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2559, p. 300 (2d ed. 1995)). Finally, there must be more than a mere scintilla of evidence in the record to render the grant

of JMOL inappropriate. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Krystek v. Univ. of So. Miss.*, 164 F.3d 251, 255 (5th Cir. 1999).

Title VII makes it unlawful for an employer to discharge an employee because of her sex, which includes discrimination because of pregnancy.[10] *See* 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e(k) (defining sex discrimination as, *inter alia*, discrimination "because of or on the basis of pregnancy"); *Krystek*, 164 F.3d at 255-56. A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. *See Urbano v. Cont'l Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998). Where the plaintiff offers circumstantial evidence, the *McDonnell Douglas*[11]-*Burdine*[12] framework requires the plaintiff to establish a prima facie case of discrimination, which, if established, raises a presumption of discrimination. *See Rutherford v. Harris County, Tex.*, 197 F.3d 173, 179-80 (5th Cir. 1999). The employer must then produce a legitimate nondiscriminatory reason for the adverse employment decision. *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000). Once the employer produces a legitimate nondiscriminatory reason, the presumption of discrimination dissipates. *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). The plaintiff bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that the employer intentionally discriminated against her because of her protected status.

---

[10] We need not analyze Wallace's TCHRA claim separately because generally such claims are analyzed under our Title VII precedent. *See Schackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999) ("[T]he law governing claims under the TCHRA and Title VII is identical."); *Rios v. Ind. Bayer Corp.*, 965 F. Supp. 919, 921 (S.D. Tex. 1997) ("[C]ourts must look to analogous federal law when resolving disputes brought under the [TCHRA].").

[11] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[12] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

*See Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511-12, 113 S. Ct. 2742, 2749-50, 125 L. Ed. 2d 407 (1993).

"To carry that burden, the plaintiff must produce substantial evidence of pretext." *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402 (5th Cir. 2001). The plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates. *See Rubinstein*, 218 F.3d at 400-01; *Rutherford*, 197 F.3d at 184; *see also Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1007 (7th Cir. 2001) (a plaintiff "must present facts to rebut each and every legitimate non-discriminatory reason advanced by [her employer] in order to survive summary judgment"). A plaintiff may establish pretext "by showing that a discriminatory motive more likely motivated" her employer's decision, such as through evidence of disparate treatment, "or that [her employer's] explanation is unworthy of credence." *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 589 (5th Cir. 1998) (quotations and citations omitted), *vacated by* 169 F.3d 215 (1999), *reinstated in pertinent part by* 182 F.3d 333 (1999).

In considering a motion for JMOL, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S. Ct. at 2109. Nonetheless, "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148-149, 120 S. Ct. at 2109.

In the case at bar, Methodist does not dispute that Wallace established a prima facie case of

-10-

discrimination. In response to that prima facie case, Methodist proffered two legitimate nondiscriminatory reasons for discharging Wallace, both of which qualified for immediate termination under Methodist's written policies without regard to her past performance: (1) she performed a procedure, namely the insertion of a nasogastric tube, without receiving a physician's order even though Methodist's written policies required an order; and (2) she falsified medical records, in that she wrote a verbal order to insert the tube without having received an order. Wallace admitted removing the Salem Sump and inserting the smaller bore feeding tube without a doctor's order, and writing a verbal order into the patient's charts in spite of the absence of such an order. Wallace maintains, however, that she was subject to disparate disciplinary treatment, and, therefore, Methodist's stated reasons were a pretext for discrimination.

At the heart of whether the district court properly granted JMOL is whether Wallace introduced substantial evidence of pretext. To that end, Wallace maintains that she adduced evidence of disparate treatment and that the district court erred in finding that the examples proffered were not of similarly situated nurses. Further, Wallace asserts that the statements by Hahus and Schmitz are not merely stray remarks, as the district court concluded, but evidence of discriminatory intent. Finally, she avers generally that her prima facie case coupled with the evidence of pretext she presented, including examples of disparate treatment, Hahus's and Schmitz's remarks, Methodist's failure to investigate, and anecdotal notes kept by Hahus and Schmitz, was sufficient to avoid JMOL. We address each of these contentions in turn, finding none of them availing.

**B**

We have held that in order for a plaintiff to show disparate treatment, she must demonstrate "that the misconduct for which she was discharged was nearly identical to that engaged in by a[n]

-11-

employee [not within her protected class] whom [the company] retained." *Smith v. Wal-Mart Stores (No. 471).*, 891 F.2d 1177, 1180 (5th Cir. 1990) (per curiam) (first and second alterations ours, third alteration in original) (quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B 1982)); *see Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1089 (5th Cir. 1995); *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991); *see also Barnes v. Yellow Freight Sys., Inc.*, 778 F.2d 1096, 1101 (5th Cir. 1985) ("When a supervisor of one race treats employees of the same race more favorably than similarly situated employees of another race under circumstances that are *essentially identical*, a presumption of discriminatory intent is raised." (emphasis added)).  Or put another way, the conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer.  *See Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304-05 (5th Cir. 2000) (requiring the plaintiff to show that the company treated others differently in "nearly identical circumstances" and finding that "the striking differences between the two men's situations more than account for the different treatment they received"); *see also Polanco v. City of Austin, Tex.*, 78 F.3d 968, 977 (5th Cir. 1996) (where jury had to reject the employer's contention that two employees were not similarly situated, the "evidence had to contradict the legitimacy of the [employer's] explanation that the differences between [the two employees] justified" the difference in treatment).

As previously mentioned, Methodist articulated two nondiscriminatory reasons for terminating Wallace:  (1) she performed a procedure, namely, the insertion of a nasogastric tube, without receiving a physician's order even though Methodist's written policies required a physician's order; and (2) she falsified medical records.  With respect to the first reason Methodist articulated, we find, with but one exception, that the nurses to whom Wallace points are not similarly situated.  These

nurses either acted under a doctor's orders, did not need a doctor's order for their actions, or no one in a supervisory capacity was aware of the nurse's actions.

Wallace does, however, provide an example of a non-pregnant nurse that performed almost the exact procedure Wallace performed without having received a doctor's order. Although she did not first remove a Salem Sump, Cheryl Gray ("Gray") inserted a nasogastric tube without having received a doctor's order to do so.[13] Further, the patient's doctor did not want a tube inserted because the patient had recently had surgery in the area where the tube was placed. Hahus and Schmitz supervised Gray. Schmitz and Hahus did not terminate Gray for her actions; instead, they only verbally reprimanded her.

The district court held that the Gray incident did not constitute evidence of disparate treatment. We agree with Wallace that this example constitutes evidence of disparate treatment with respect to the first reason Methodist articulated. Methodist offered two *independent* reasons for terminating Wallace, each of which alone could have served as a basis for terminating her without regard to her past performance. Consequently, Gray did not have to also falsify the medical record, as the district court had required, in order for the incident to demonstrate disparate discipline as to Methodist's first reason.[14] Accordingly, we find that Wallace has put forward evidence of disparate treatment with respect to the first reason Methodist articulated.

Nevertheless, Wallace failed to proffer evidence that any non-pregnant nurse falsifying a

---

[13] Although initially Wallace contends that Gray also recorded a verbal order for the procedure, thus falsifying the record as Wallace did, Wallace admits in her reply brief that Gray did not indicate on the patient's chart that she had inserted a nasogastric tube.

[14] We note that Methodist did not assert that these two acts together constituted a single nondiscriminatory reason for Wallace's termination. As a result, we have focused solely on what Wallace must show in order to rebut *each* of the independent reasons Methodist asserts.

patient's record received more favorable treatment. To the contrary, the record reflects that Methodist terminated another nurse for falsifying a medical record. Thus, Wallace falls short of her burden of presenting evidence rebutting *each* of the legitimate nondiscriminatory reasons produced by Methodist.

## C

In light of Wallace's failure to rebut each of the reasons Methodist proffered, the comments of Schmitz and Hahus must satisfy the test we laid out in *Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir. 1996), in order to constitute sufficient evidence of discrimination. *See Rubinstein*, 218 F.3d at 400-01; *Auguster*, 249 F.3d at 405 (concluding that while we had questioned the vitality of our stray remarks doctrine post-*Reeves*, the doctrine remained intact "at least where the plaintiff has failed to produce substantial evidence of pretext"). That test is: "[F]or comments in the workplace to provide sufficient evidence of discrimination, they must be '1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.'" *Krystek*, 164 F.3d at 256 (alteration in original) (quoting *Brown*, 82 F.3d at 655). Where "[c]omments [] are vague and remote in time [they] are insufficient to establish discrimination. In contrast, specific comments made over a lengthy period of time are sufficient." *Brown*, 82 F.3d at 655-56 (internal quotations and citations omitted); *see Wyvill*, 212 F.3d at 304 ("In order for a[] [protected class-]based comment to be probative of an employer's discriminatory intent, it must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that [the employee's protected class] was a determinative factor in the decision to terminate the employee.").

Wallace points to two remarks Schmitz made: (1) "I don't know how to classify you because you were gone three months and now you'll be gone three months again"; (2) Schmitz's answer as to why Wallace was fired — "First of all, she's been pregnant three times in three years." Schmitz admitted that she may have made the first statement but explained that one of the factors for promotion was experience and that two years of experience was a cutoff. Schmitz was uncertain whether she should count the time Wallace spent on maternity leave as part of her experience. Schmitz's statement merely refers to Wallace's absences from work due to her maternity leaves. It is only if we infer that Schmitz's reference to Wallace's absences is code language for Wallace's pregnancies that it relates to Wallace's protected class. If we were to make this inference and countenance this general statement as evidence of discriminatory intent, we would find in effect that any employer's remark observing that an employee has taken leave constitutes such evidence. We decline to do so for, as the Seventh Circuit has stated, "[t]he [Pregnancy Discrimination Act] requires the employer to ignore an employee's pregnancy, but . . . not her absence from work, unless the employer overlooks the comparable absences of non-pregnant employees." *Marshall v. Am. Hosp. Ass'n*, 157 F.3d 520, 526 (7th Cir. 1998) (quoting *Troupe v. May Dep't Stores*, 20 F.3d 734, 738 (7th Cir. 1994) (holding that the supervisor's failure to give employee new assignments once she announced that she was pregnant and that her maternity leave would occur during the two months prior to the employer's busiest time did not constitute evidence of discrimination).

Next, Gaskin overheard Schmitz state that Wallace was fired because "[f]irst of all, she's been pregnant three times in three years." In support of her contention that Schmitz's comment is probative evidence of discriminatory intent, Wallace relies on *EEOC v. Manville Sales Corp.*, 27 F.3d 1089 (5th Cir. 1994). Rather than demonstrating the probative value of Schmitz's comment,

-15-

*Manville* illustrates why Schmitz's comment fails to satisfy the *Brown* test. In *Manville*, the evidence established that Morris, the district manager of the area in which the plaintiff worked as a sales representative, though not the ultimate decision-maker, recommended the plaintiff's discharge. *See id.* at 1091. By contrast, while Schmitz participated in the investigation of the incident that led to Wallace's termination, Wallace presented no evidence that Schmitz recommended termination or otherwise participated in the decisionmaking process. *See Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996) ("To be probative, allegedly discriminatory statements must be made by the relevant decision maker."); *see also Haas v. ADVO Sys., Inc.*, 168 F.3d 732, 733-34 (5th Cir. 1999) (interviewer's comment that his "only concerns about hiring [the plaintiff] were [his] age" constituted indirect evidence of discrimination because the jury could infer that the interviewer's discriminatory view tainted his recommendation against hiring plaintiff and that the ultimate decisionmaker relied on this recommendation (first alteration ours, second alteration in original). Furthermore, because Schmitz did not participate in the decision to terminate Wallace and Schmitz's statement offers no indication that she was privy to those reasons, Schmitz's statement is, at best, her opinion of why Methodist terminated Wallace. We have previously held that a similar statement was merely a stray remark where the statement reflected solely the speaker's opinion of the basis for an employment decision and the speaker had not exercised influence over that process. *See Krystal*, 164 F.3d at 256. Thus, Schmitz's comment is not evidence of intentional discrimination.

Wallace points to the following remarks made by Hahus: (1) "How stupid could you be?"; (2) "You are still costing the hospital money because you are receiving full benefits and giving 80 hour pay periods"; and (3) Wallace "needed to choose between nursing and family." As an initial matter, Hahus's remarks satisfy *Brown*'s third criterion, i.e., that a person with authority over the

employment decision has made the comment. We find that Hahus's comments are nonetheless deficient under the remaining *Brown* factors.

Hahus made the first remark sometime within the six months prior to Wallace's discharge. This comment is neither related to Wallace's protected class nor is it related to her termination. The word "stupid" is not an epithet or a slur referring to a pregnant woman, it simply denotes a lack of intelligence. That Hahus intended this denotation is borne out by the circumstances prompting this comment — Wallace drew blood to test the level of a drug she had just administered, fully knowing that it would register a "false high." *See EEOC v. Tex. Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996) (holding that statement was stray remark where it was "consistent with the context in which it was allegedly made"). Thus, we conclude that this statement does not constitute evidence of discrimination.

Sometime shortly after Wallace's return to work from her second maternity leave, Hahus also remarked to Wallace that she was "still costing the hospital money because [she was] receiving full benefits and giving 80 hour pay periods." Wallace's testimony established that Hahus mentioned the availability of the compressed schedule to a group of nurses, among whom Wallace was standing. Wallace then expressed her desire to work a compressed schedule to which Hahus responded with the above comment. In context, the comment is simply a statement of Hahus's view of the compressed schedule program. *See id.* This remark had nothing to do with Wallace's status as a pregnant woman or any future employment decision and it is not probative of discriminatory intent.

Wallace contends that Hahus's statement that Wallace "needed to choose between work and family" is akin to the supervisor's comment to the plaintiff in *Deffenbaugh-Williams* that the plaintiff would "never move up with the company being associated with a black man." 156 F.3d at 584. We

disagree. The statement in *Deffenbaugh-Williams* unequivocally related to the plaintiff's ability to advance in her workplace solely because of her relationship with an African-American man. By contrast, here, while Hahus's comment may reflect a stereotype about a woman's commitment to the workplace while maintaining a family life,[15] it does not relate specifically to an employment decision of any kind as did the statement in *Deffenbaugh-Williams*. Additionally, in the same meeting in which Hahus made this comment, she nonetheless gave Wallace a satisfactory evaluation, resulting in a merit pay raise. Therefore, we find that the statement is not probative evidence of discriminatory intent. In short, we find that none of the statements made by Schmitz or Hahus constitute sufficient evidence of discriminatory intent.

**D**

Finally, Wallace contends generally that the district court "invaded the province of the jury" in granting Methodist's motion for JMOL. Specifically, Wallace asserts that she presented substantial evidence of pretext, i.e., evidence of disparate treatment, Hahus's and Schmitz's remarks, Methodist's failure to investigate, and the anecdotal notes Schmitz and Hahus kept. She further maintains that her prima facie case considered in tandem with the substantial evidence of pretext rendered the district court's grant of JMOL inappropriate under *Reeves*. We find these contentions unavailing.

In support of her argument that she proffered substantial evidence of pretext, Wallace reiterates her contentions regarding the evidence of disparate treatment and Hahus's and Schmitz's statements. As examined above, Wallace failed to offer evidence rebutting both of the legitimate

---

[15]    *See, e.g.*, Deborah L. Rhode, *Speaking of Sex: The Denial of Gender Equality* 153 (1997) (arguing that "women who make families a priority . . . hear that they are not sufficiently 'committed' to their careers").

-18-

nondiscriminatory reasons Methodist produced, and the remarks on which she relies cannot alone constitute sufficient evidence of discrimination.

The record also belies Wallace's contentions regarding Methodist's failure to investigate the incident leading to her termination. Trial testimony showed Schmitz spoke with both Dr. Barrosa and Dr. Hanania regarding that incident. At Hahus's direction, Schmitz also contacted Wallace to ascertain whether Wallace had written a verbal order and inserted the feeding tube, both without having received a doctor's order. Wallace admitted that she had done so and Schmitz informed Hahus as such. Hahus verified with Dr. Hanania that he had not given Wallace a verbal order to insert the feeding tube. Regarding the incident, Hahus consulted with the chairman of the peer review committee, Methodist's director of medicine, and Hansen, Methodist's director of nursing and Hahus's supervisor. Although Wallace makes much ado about Hahus not contacting Methodist's Human Resources Department, testimony established that Hansen consulted with the department, thereby complying with Methodist's own procedures.

Additionally, Wallace requested and received an informal grievance hearing. At that hearing, Wallace again admitted inserting the tube and writing the order without the requisite physician's order. In her defense, she alleged that other nurses routinely engaged in the same conduct for which she was being terminated. Wallace faults Methodist for not investigating this general allegation. In light of the undisputed evidence of the steps Methodist took to investigate the incident and Wallace's repeated admissions to the acts that were the basis for her termination, that Methodist did not investigate Wallace's generalized opinion that she was subject to disparate treatment does not demonstrate pretext. *Cf. Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1186 (5th Cir. 1997) (finding that the plaintiff's conclusory assertions of less favorable treatment, absent specific examples,

-19-

were insufficient to establish discrimination).

Wallace also asseverates that anecdotal notes kept by Hahus and Schmitz showed discriminatory animus. The fact that Hahus and Schmitz kept these notes does not in and of itself demonstrate discriminatory intent because Hahus and Schmitz kept notes regarding *every* MICU employee. The notes chronicled incidents in each employee's performance. Hahus and Schmitz used these notes to assist in their formal performance evaluations of MICU employees and to address problems an employee might have without immediate resort to Methodist's more formal due process system.

Wallace asserts that these notes are "replete with references to her consecutive maternity leaves and contain increasingly critical remarks with each pregnancy." The references in the notes to Wallace's maternity leaves merely mention that Wallace had been on leave. Critical comments are made throughout the notes regarding Wallace's performance. Moreover, Wallace's termination was made without regard to her past performance, rendering these notes irrelevant rather than demonstrative of discriminatory animus, as Wallace contends.

Wallace's failure to proffer substantial evidence of pretext undermines her related contention that the evidence of pretext coupled with her prima facie case provides sufficient evidence of discrimination to withstand a motion for JMOL.

### III

In sum, the evidence is undisputed that Wallace engaged in the acts for which Methodist terminated her. Further, although she adduced evidence rebutting one of the legitimate nondiscriminatory reasons Methodist produced, she failed to proffer evidence rebutting the second reason, namely, the falsification of medical records. Neither the comments on which she relied nor

the anecdotal notes demonstrated discriminatory intent. Finally, the record reveals that Methodist conducted an investigation of the incident giving rise to Wallace's termination. We conclude that there was no legally sufficient basis from which the jury could conclude that Wallace had been discharged because of discrimination. Accordingly, the district court did not err in granting Methodist's motion for JMOL.

For the foregoing reasons, we AFFIRM.