MAX N. TOBIAS, JR., Judge.
hThe plaintiff-appellant, David Knapper (“Knapper”), appeals the trial court’s grant of summary judgment to the defendant-appellee, Hibernia National Bank (“Hibernia”) on his racial discrimination claim filed under La. R.S. 23:331, et seq. For the following reasons, we affirm.
I. PROCEDURAL BACKGROUND
Knapper, an African American male, was terminated from his employment at Hibernia National Bank after working seven years as a loan collector. He subsequently filed suit alleging his discharge was the result of racial discrimination in violation of La. R.S. 23:332.[1] Specifically, Knapper alleges that he was |2terminated *900 because of his race, preceded by failing to grant him pay raises, denying him promotional opportunities, and subjecting him to discipline under circumstances where similarly situated Caucasian employees were not disciplined.[2] Knapper also made claims for retaliatory discharge under the Louisiana Employment Discrimination Law (“LEDL”) and retaliatory discharge under the Louisiana Whistleblower’s statute.
Hibernia filed a Renewed Motion for Summary Judgment.[3] The trial court granted the motion, dismissing Knapper’s claims for retaliatory discharge under the LEDL and the Whistleblower’s statute, but denied the motion with respect to his racial discrimination claim. Knapper’s case proceeded to trial in May 2005. During the course of the second day, realizing the trial could not be completed within the allotted time, the trial court granted a mistrial at Knapper’s request.
In light of testimony presented at the mistrial, Hibernia re-urged its Motion for Summary Judgment seeking dismissal of Knapper’s claim that he was ^discharged due to racial animus. The trial court granted Hibernia’s motion, but did not assign reasons. It is from this judgment that Knapper timely appeals.
II. FACTUAL BACKGROUND
Knapper was employed by Hibernia from 1995 until 2001 as a “front end direct unsecured/other secured loan collector” (hereafter “FEDUOSLC” or in the plural, “FEDUOSLCs”).[4] Knapper was hired as an Adjuster III (a senior loan collector) based on representations he made concerning his prior work experience.[5] His primary job duties included the collection of delinquent loan accounts.[6] As per bank policy, Knapper received his first employment evaluation in March 1996. His then supervisor, Nancy Alvarado, assigned Knapper an overall rating of “meets some requirements.” Knapper did not receive a merit increase in compensation. In March 1997, Alvarado conducted Knapper’s second annual performance review and rated him as “does not meet requirements.” *901 Again, Knapper was not given a merit increase due to his unsatisfactory job performance and was placed on probation.
In 1997, Steve Larmann replaced Alvarado as Knapper’s supervisor and manager of Hibernia’s collections department. Lar-mann immediately began making changes, including instituting standardized quotas for collectors. As one of eight FED-UOSLCs, Knapper was assigned a specific dollars collected goal on a monthly basis. This amount was the same for each front end direct 14unsecured/other secured loan collector. The collectors were expected to achieve their monthly dollars-collected goal fifty percent of the time, and were further expected to achieve their goal, or come within ten percent of their goal, at least every other month or face discipline. Knapper exhibited difficulty in attaining the required quotas initiated by Larmann. In an effort to address and assist Knapper in achieving his performance goals, in December 1997, Hibernia instituted numerous measures including counseling, creating a performance plan, and assigning Knapper to a new portfolio as a rehabilitative transfer.
Knapper was due for his annual performance evaluation in March 1998, but in February, Hibernia placed him on probation based upon his continued failure to attain his dollars-collected goal. Consequently, Larmann deferred Knapper’s annual evaluation due to his unsatisfactory performance and issued a memo providing notice of this administrative decision. Knapper continued to receive counseling during the subsequent months to encourage him to make his performance goals. His performance did improve, as evidenced by his February 1999 review, wherein Knapper received a satisfactory review. In recognition of Knapper’s achievement, he was given a merit increase, which was made retroactive. This was Knapper’s first pay increase since his hire four years earlier in 1995.
Knapper was apparently not able to maintain his satisfactory performance and received three formal counselings prior to his next annual review.[7] In his May 2000 evaluation, Knapper achieved his monthly dollars-collected goal for only two |sof twelve months (January 1999 and December 1999) and was found deficient in several performance areas. Consequently, Knapper received an overall rating of “meets some requirements” and was not given a merit pay increase.
In December 2000, Larmann granted all collectors “amnesty,” giving each collector a “fresh start” for progressive discipline purposes,[8] in conjunction with the imposition of strict performance goals in January 2001.[9] In March 2001, Knapper received a verbal warning for having missed his dollars-collected goals in January and February 2001. Knapper failed to meet his dollars-collected goal again in March and received a written warning. When Knapper failed to meet his dollars collected goal again in April, he was placed on 90 days probation for having failed to achieve *902 his dollars collected goals for four consecutive months. Under the terms of the probation, Knapper was required to achieve his monthly dollars collected goal for the next three consecutive months.
Knapper achieved his dollars collected goal for May 2001, but failed to attain the same goals during the month of June, in violation of the terms of his probation. Because Knapper had taken vacation time in June, instead of being terminated, Hibernia extended his probation period. On 9 July 2001, Knapper was warned that his call production was below requirements. Thereafter, Knapper failed to achieve his goal for July. This violated the terms of his probation as he had missed his collection goals two of the three months of his original probationary ^period. Consequently, in accordance with the terms of the probation, Hibernia terminated Knapper on 8 August 2001.
III. STANDARD OF REVIEW
We review a district court’s grant of summary judgment de novo, applying the same criteria that govern the district court’s consideration of whether summary judgment is appropriate. Costello v. Hardy, 03-1146, p. 8 (La.1/21/04), 864 So.2d 129, 137.
IV. DISCUSSION
The only claim before this court is Knapper’s termination claim. As in any discrimination case, Knapper is charged with the ultimate burden of proving that Hibernia intentionally discriminated against him based on his race.[10] St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 508, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). A plaintiff can seek to establish a case of intentional discrimination by direct or circumstantial evidence. Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 219 (5th Cir.2001). Where a plaintiff can only muster circumstantial evidence that discriminatory animus played a role in an employment decision, the plaintiff must rely on the McDonnell Douglas burden-shifting framework to create a presumption of intentional discrimination.[11] To create such a presumption, the plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897 (5th Cir.2002). In the instant case, Knapper presents only circumstantial evidence of discrimination. Therefore, to establish a prima facie case of discrimination, Knapper must show that he (1) was a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably. See Urbano v. Continental Airlines, Inc., 138 F.3d 204, 206 (5th Cir.1998).
Upon establishing a prima facie case under the McDonnell Douglas framework, *903 the burden then shifts to the defendant to set forth a legitimate non-discriminatory explanation for the adverse employment decision. Texas Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The burden is one of production and not persuasion. Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000). It cannot, therefore, involve a credibility assessment. Id. If the defendant is able to articulate a legitimate non-discriminatory reason, the plaintiff must then establish by a preponderance of the evidence that the defendant’s proffered reasons were not its true reasons. Id. In short, the plaintiff must produce substantial evidence that the defendant’s nondiscriminatory reason is merely a pretext for impermissible discrimination. Wallace, 271 F.3d at 220. Where the plaintiff fails to produce substantial evidence of pretext, or produces evidence permitting only an indisputably tenuous inference of pretext, summary judgment in favor of the defendant is appropriate. Id. Even if the plaintiff is able to make a showing as described above, judgment for the employer may be appropriate where “no rational fact-finder would conclude that the action was discriminatory.” Reeves, 530 U.S. at 148, 120 S.Ct. at 2109.
| sIn the context of this analytical framework, we now turn our attention to Knapper’s racial discrimination claim. Knapper’s complaint charges Hibernia with impermissibly discriminating against him on the basis of race in the termination of his employment. For purposes of its motion for summary judgment only, Hibernia concedes Knapper meets the first three criteria for establishing a pri-ma facie case of racial discrimination: namely, that he was within the relevant protected class, at some point he was qualified for the position he held, and that he was terminated.
Thus, the sole issue presented on appeal is whether Knapper can carry his burden of establishing the fourth element, that is, that a similarly situated employee outside of the protected class (i.e., a Caucasian employee) was treated more favorably. In other words, Knapper must show that a Caucasian employee was treated differently under circumstances “nearly identical” to his. Okoye v. University of Texas Houston Health Science Center, 245 F.3d 507, 514 (5th Cir.2001).[12] Alternatively, it has been recognized that a plaintiff may also establish the fourth element by demonstrating that he was replaced by someone outside of the protected class. Id. at 512-513.
Knapper contends that the record reveals a consistent pattern of disparate treatment as similarly situated Caucasian loan collectors were given preferential treatment at his expense. First, Knapper avers the evidence supports a finding that Hibernia did not discipline him in the same fashion as Caucasian employees who also failed to meet their monthly performance standards. In support, Knapper points to the treatment of five Caucasian Hibernia loan collectors: Mike Faciane (claims he missed dollars collected goals for five consecutive months in 1999 and 19was not disciplined); Robert Flanagan (alleges he was given a raise to $23,520 in November 2000, despite missing the prior four monthly goals and six out of the previous seven); Marjorie Fricke (avers she was not disciplined for missing her dollars-collected goals for three straight months in 1999 *904 and that she was hired at a salary more than $4,000 above Knapper’s); William Bu-randt (claims he was not disciplined despite missing his goals in April, May and June 1999); and Melissa Breaux (contends she missed her dollars-collected goal in March and April 2001, but was not disciplined).
We find Knapper’s argument, however, is without merit. The record clearly shows that during this timeframe (prior to 2001), Knapper received the same benefit of lax enforcement of the performance standards. Knapper’s employment records reveal that in 1998 he missed his monthly goals five months in a row without being disciplined. Then, in 1999, he failed to meet his monthly goals in June, July, October, and November, and did not receive any disciplinary warning. Knapper also failed to achieve his monthly goals for seven consecutive months (from June through December) in 2000, without being terminated; rather, he received only one formal counseling during that seven-month period.
Regarding Melissa Breaux (whom Knap-per contends was not disciplined after missing her goals in March and April of 2001), the record reflects that she was removed from her position in April due to a posting error. When she returned to the department to fill a vacancy, this constituted a promotion and she entered into a three-month probationary period during which employees customarily are not subject to discipline, but rather, are evaluated at the end of the three-month | ^probationary period. Breaux failed to meet her performance goals during the final two months of her probation (June and July 2001) and her probation was extended an additional month. Breaux, however, submitted her resignation in August-2001.
As noted above, Hibernia announced amnesty to all loan collectors for the months preceding January 2001, at which time Larmann instituted strict enforcement of progressive discipline for failure tó meet monthly goals. The record reveals that in 2001, Hibernia was actively enforcing discipline for missing monthly performance goals. Specifically, in addition to Knapper, five employees — one Caucasian, one Hispanic, and three African Americans — were issued warnings for failure to achieve production goals. Additionally, a probationary employee, Heather August, was terminated in March 2001, for repeatedly failing to reach her performance goals.
Knapper further points to the fact that Flanagan missed his goals in January and February 2001, and then again in July and July 2001, without being disciplined. Knapper contends this is evidence of disparate treatment. Hibernia, however, was not able to locate any disciplinary action for June and July 2001. According to Larmann, Hibernia’s immediate supervisors were responsible for issuing warnings, and Ernesto Mora, Flanagan’s immediate supervisor, was deployed on military duty in Iraq during this timeframe. Hibernia contends this is the only instance in which discipline was not issued after 1 January 2001. We find that this one instance is insufficient to establish that Hibernia’s disciplinary policy was disparately enforced.
|nKnapper was one of eight FED-UOSLCs.[13] The record supports the fact *905 that all eight performed the same job and were held to the same performance standards. Specifically, in order to avoid discipline, they were expected to achieve their monthly dollars collected goal, or come within ten percent, every -other month. According to the summary judgment evidence, the front end collectors were generally able to meet these requirements except for Knapper. The numbers below show the comparative performance of the FEDUOSLCs based upon their respective periods of employment.[14]
[[Image here]]
We agree with Hibernia that the information contained in the table above, which includes Caucasian comparables similarly situated to Knapper (ie., Burandt and Breaux), demonstrates that Knapper was not treated less favorably than similarly situated employees outside the protected class. Put simply, Knapper cannot identify any Caucasian FEDUOSLC who performed as poorly (or more poorly) than Knapper who was retained, or who missed his or her goal for four months in a row subsequent to 1 January 2001 (when progressive discipline for strict performance standards was imposed), who was not put on probation in accordance with those standards.
Hibernia expected Knapper to attain his dollars collected goal, or come within 10% of this goal at least every other month. In Knapper’s final 14 months he attained his goal only once. Those who performed well *906 were retained, regardless of race. Of the other three employees who were employed at Hibernia for 31 months, Knapper was the only one who performed poorly at 19%. Knapper was given a number of counselings and warnings about his poor performance. Larmann established performance plans in an effort to help Knapper increase his performance. Knapper was aware of the discipline program if the set goals were not attained, and still his overall goal attainment was 35% lower than the employee with the lowest percentage.
Next, Knapper contends that the initial starting salaries of several Caucasian employees that exceeded his overall salary demonstrates disparate treatment. We find that Knapper’s evidence on this issue is equally unavailing and not supported | isby the record for, while Knapper may have been paid less than a number of Caucasian loan collectors, his salary also fell below other African American loan collectors.
According to the evidence, Hibernia granted pay raises based on merit and job performance. Because Knapper habitually did not meet his set performance goals, there were several years where he did not receive a salary increase and his annual salary remained the same. A review of Hibernia’s business records, specifically the Pay Rate History Report, reveals that no general pay disparity existed between Caucasians and African Americans throughout Hibernia’s collection department:
_Name_Rate of Pay_Race_
Eggula “Marie” Green_$34,000_African American
Alma Griffin_$32,095_African American
Michael Faciane_$30,900_Caucasian_
Marjorie Fricke[15]_$28,800_Caucasian_
Desmond Davis_$28,200_African American
William Burandt_$27,600_Caucasian_
Heather August_$27,000_African American
Michael Bechet_$26,400_African American
Horace Dorsey_$25,500_African American
JjjBelinda Ferrand_$24,150_African American
David Knapper_$24,020[16]_African American
Robert Flanagan_$23,520_Caucasian_
Melissa Breaux_$23,500_Caucasian_
Barbara Hardeman_$23,400_African American
Lillie Guichai’d$20,085_African American
*907 We conclude that Knapper has failed to present any evidence suggesting that other similarly situated employees outside of the protected class, ie. Caucasian FEDUOSLCs, were treated more favorably than he was treated. Therefore, in order to establish the fourth element of proving a prima facie case of racial discrimination, Knapper must show that Hibernia replaced him with a member outside of the protected class.
Knapper contends he was replaced by Mitchell Ansardi, a Caucasian male. In support of his contention, Knapper avers that Ansardi was the next person hired into the collection department in October 2001 at a salary of $27,000. Contrariwise, Hibernia contends that Knapper was replaced by Desmond Davis, an African American male. Davis was originally hired by Hibernia as a collector in October 1999. During the first part of 2001, Davis was on active military duty and returned to Hibernia from military leave immediately prior to Knapper’s termination. Upon his return to Hibernia, Davis was being used as a “float” in the collections department. When Knapper was terminated, Davis was assigned to 115Knapper’s portfolio and remained in that position until he was recalled to active military duty in January 2003. The record also establishes that soon after Knapper was terminated, both Breaux and Flanagan resigned. Then, in October 2001, Hibernia claims it hired Ansardi to replace Flanagan. According to our de novo review of the record, we find no genuine issue of material fact that Knapper was replaced by Davis, an African American, and not by Ansardi.
CONCLUSION
We conclude that Knapper’s claim fails as he has not carried his burden of proving a prima facie case of racial discrimination. Knapper has failed to show that similarly situated employees outside of the protected class (ie., Caucasian FEDUOSLCs) were treated more favorably than he was or that he was replaced by someone outside of the protected class. We further find that Knapper has failed to raise a genuine factual dispute concerning whether the differential treatment to which he claims he was subjected was imposed because of his race rather than as a result of his continuous poor job performance. Based upon our de novo review of Hibernia’s business records, in addition to the affidavits and depositions contained in the record, we find Hibernia had a legitimate, nondiscriminatory reason for Knapper’s discharge. Accordingly, the district court’s order granting judgment in favor of Hibernia is affirmed.

AFFIRMED.

. La. R.S. 23:332 provides, in pertinent part:
A. It shall be unlawful discrimination in employment for an employer to engage in any of the following practices:
(1) Intentionally fail or refuse to hire or to discharge any individual, or otherwise to intentionally discriminate against any individual with respect to his compensation, or his terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin.
(2) Intentionally limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee, because of the individual’s race, color, religion, sex, or national origin.
[[Image here]]
H. Notwithstanding any other provision of this Section, it shall not be unlawful discrimination in employment for:
[[Image here]]
(3)An employer to apply different standards of compensation or different terms, *900 conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production, or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin.
(4) An employer to give and to act upon the results of any professionally developed ability test, provided that such test, its administration, or action upon the results is not designed, intended, or used to discriminate because of race, color, religion, sex, or national origin.

.Knapper’s case is not based on direct evidence of racial animus or retaliatory motive. Instead, Knapper contends Hibernia tried to hide its discrimination and retaliation through manipulation and selective application of its rules regarding employee evaluations, pay, job-postings, and collection goals.

. Hibernia's original motion for summary judgment was never heard because Knapper filed a Supplemental and Amending Petition prior to the hearing date on Hibernia’s motion.

. Knapper was one of eight FEDUOSLCs. They performed identical functions and were held to identical standards. The position had been in existence for a number of years and Hibernia had established valid and attainable goals for that position.

. It was later revealed that Knapper falsified his employment application by failing to disclose his involuntary termination by several former employers.

. Although Hibernia’s loan collection departments vary depending upon the type of loan, all front end direct unsecured/other secured loan collectors are assigned the same specific goal of dollars collected on a monthly basis.

. Knapper was counseled twice for attendance issues and once for performance issues.

. Progressive discipline is a system implemented by Hibernia to discipline collectors who do not attain their goals. According to the Hibernia Employee Handbook, which was given to Knapper at the time of his hiring, if a collector failed to achieve the set goals for two consecutive months, he/she would be subject to a verbal warning; three consecutive months, a written warning; and after four consecutive months, he/she would be placed on probation for 90 days.

.As Knapper had missed his dollars collected goals for seven consecutive months at the end of 2000, this amnesty greatly benefited Knap-per.

. The Louisiana statutes are similar in scope to the federal prohibitions against discrimination embodied in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq, (1986). Louisiana courts have found it appropriate, when interpreting our own law, to consider interpretations of the federal statute. Montgomery v. Lobman, Carnahan, Batt & Angelle, 98-2098, p. 4 (La.App. 4 Cir. 2/17/99), 729 So.2d 1075, 1077, citing Hammond v. Medical Arts Group, Inc., 574 So.2d 521, 523 (La.App. 3 Cir.1991); Bennett v. Corroon and Black Corp., 517 So.2d 1245 (La.App. 4 Cir.1987).

. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Claims under the LEDL are subject to the same analysis as discrimination claims under federal Title VII of the Civil Rights Act of 1964. See Hicks v. CLECO, Inc., 712 So.2d 656 (La.App. 1 Cir.1998); Plummer v. Marriott Corp., 654 So.2d 843 (La.App. 4 Cir.1995).

. "In disparate treatment cases, the plaintiff must show 'nearly identical’ circumstances for employees to be considered similarly situated.” Berquist v. Wash. Mut. Bank, 500 F.3d 344, 353 (5th Cir.2007).

. In addition to the eight FEDUOSLCs, Hibernia’s collection department included four back end direct secure/unsecure collectors and two front end real estate collectors. The collection department also included one back end real estate collector, one master credit collector, and a C.C.C.S. collector. While Knapper seeks to compare himself to these other Caucasian loan collectors to show disparate treatment, the record establishes that *905 these other collectors were not "nearly identical” and, thus, were not similarly situated to Knapper, a FEDUOSLC, as their portfolios differed and they did not share the same standards and goals. We find that the appropriate comparators in this case are the seven other FEDUOSLCs who were required to meet the identical established goals and performance standards as Knapper.

. The number of months worked by each FEDUOSLC from 1999 to 2002 varies due to turnover.

. Knapper complains that Fricke was hired at a starting salary ($24,000) that exceeded his annual pay and that this shows disparate treatment. However, when Larmann took over Hibernia’s collection department in 1997, he testified that he sought to raise the incoming salaries in order to attract more qualified applicants to fill the open positions. While this did result in a disparity in salaries between newly hired adjusters and those already employed in the collection department, this does not show racial animus. This is borne out by the record which shows that Hibernia hired Heather August, an African American, at a starting salary of $27,000.

. According to Knapper's 1999 annual review, he was earning $1,716.66 per month, or $20,600 annually. Due to his poor performance and result of a lack in annual pay raises, Knapper’s salary had fallen behind his peers. In April 2001, in order to rectify this, he received an equity increase of $284.97 per month, increasing his annual salary to $24,020.