# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
May 12, 2009

Charles R. Fulbruge III
Clerk

No. 07-31027

THEODORE KNATT

Plaintiff-Appellant-Cross-Appellee

v.

HOSPITAL SERVICE DISTRICT NO. 1 OF EAST BATON ROUGE PARISH, doing business as Lane Memorial Hospital; HERBERT C OWEN, JR, Individually and in the capacity as the Board of Commissioners of Lane Memorial Hospital; NICK F ADAMS, Individually and in the capacity as the Board of Commissioners of Lane Memorial Hospital; ETTA K HEARN, Individually and in the capacity as the Board of Commissioners of Lane Memorial Hospital; STEVE STEIN, Individually and in the capacity as the Board of Commissioners of Lane Memorial Hospital; CATHERINE A POURCIAU, Individually and as the capacity as the Board of Commissioners of Lane Memorial Hospital; ROBERT WILLIAMS, SR, Individually and in the capacity as the Board of Commissioners of Lane Memorial Hospital; RICHARD RATHBORNE, Individually and in the capacity as the Executive/Bylaws Committee of Lane Memorial Hospital; JUAN MEDINA, Individually and in the capacity as the Executive/Bylaws Committee of Lane Memorial Hospital; DONALD FONTE, Individually and in the capacity as the Executive/Bylaws Committee of Lane Memorial Hospital; TERRY WHITTINGTON, FACHE, Individually and in his capacity as an Employee and Chief Executive Officer of Lane Memorial Hospital; A KEITH HEARTSILL, Certified Public Accountant, Fellow of the Healthcare Financial Management Association, Individually and in his capacity as and Employee and Chief Financial Officer of Lane Memorial Hospital; JENNIFER S JOHNSON, Registered Nurse, Master of Science in Human Services Administration, Individually and in her capacity as an Employee and Chief Nursing Officer of Lane Memorial Hospital

Defendants-Appellees-Cross-Appellants

JERRY BOUDREAUX, Individually and in the capacity as the Board of

Commissioners of Lane Memorial Hospital; RONNIE MATTHEWS, Medical Doctor, Individually and as Chief of Surgery at Lane Memorial Hospital; KAREN REDMOND, Registered Nurse, Individually and in her capacity as an Employee of Lane Memorial Hospital; JEANNE PARTIN, Registered Nurse, Individually and in her capacity as Unit Director and an Employee of Lane Memorial Hospital; LISA SHEPPARD, Individually and in her capacity as an Employee of Lane Memorial Hospital; ELIZABETH FAYE POLLARD, Licensed Practical Nurse, Individually and in her capacity as an Employee of Lane Memorial Hospital; LAURA L PEEL, Licensed Practical Nurse, Individually and in her capacity as an Employee of Lane Memorial Hospital; KATHLEEN MATTHEWS, Individually and in her capacity as an Employee of Lane Memorial Hospital; CLINO MELKER, Certified Registered Nurse Anesthetist, Individually and in her capacity as an Employee of Lane Memorial Hospital; JULIE W AUSTIN, Individually and in her capacity as an Employee of Lane Memorial Hospital; DENISE S DUNN, Individually and in her capacity as an Employee of Lane Memorial Hospital

Defendants-Appellees

---

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:03-CV-00442

---

Before DAVIS, CLEMENT, and ELROD, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:[*]

Dr. Theodore Knatt appeals the district court's dismissal of several of his claims against the hospital where he practiced, its administration and various doctors and nurses who worked there. After hearing argument, considering the briefs and undergoing an extensive review of the record, we affirm in part, vacate in part, and remand to the district court.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## FACTS AND PROCEEDINGS

In 1995, Knatt, who is black, was recruited by Lane Memorial Hospital ("Lane") to locate his orthopaedic surgery practice in Zachary, Louisiana. He was very successful there.[2] In early 2001, Knatt announced he intended to invest in and spearhead development of Howell Place, a hospital-surgery center and office building that would compete with Lane. Lane was invited to participate in the project but declined. Knatt alleges that "[s]hortly after [he] made it known that it was his intent to go forward with the Howell Place Project," he became subject to harassment and discrimination as part of a conspiracy to destroy his practice. According to Knatt, the retaliation culminated in his suspension from practice at Lane by the hospital's Medical Executive Committee (MEC).

The following facts were presented by the defendants relative to Knatt's summary suspension. Knatt suffered from personal medical problems in the first half of 2002. He went to the emergency room twice for gastroesophageal reflux disease (GERD), which sometimes caused his heart to race and his chest to hurt. He also had neck pain with associated left shoulder pain. On April 26, 2002, Knatt saw an endodontist who initiated a root canal procedure. That afternoon, he performed surgery at Lane. The OR technician and scrub technician who assisted Knatt that day said that his behavior was different—he scrubbed faster, was blank faced, moved slowly, and said he was not feeling well. He asked for a stool to sit on, which they said was different from his usual practice. The OR staff also reported that he had trouble putting instruments together, dropped instruments and did not put them back in their slots, all of which was out of character. The same technician observed Knatt acting in the same way in surgery a week later and made a similar report to her supervisor.

---

[2] For example, a study conducted by Lane in 2001 concluded that 29% of the income it earned from the five orthopedic surgeons on staff was generated from Knatt's surgeries.

On May 6, 2002, Knatt returned to the endodontist for the completion of the root canal. On May 7, Knatt performed a hip procedure at Lane. He was late and had to be awakened twice because he was sleeping in the doctor's lounge. Knatt had trouble putting drapes on the patient and seemed sluggish. The nurses took their concerns about Knatt to Jennifer Johnson, Lane's Chief Nursing Officer, and reported to her that they were concerned about the welfare of patients and the working conditions with Knatt in the operating room.

The MEC, which consisted of Dr. Juan Medina, Dr. Donald Fonte, and Dr. Richard Rathbone, had a regular meeting scheduled the next day on May 8. After the committee concluded its regular business, Johnson told the MEC that she had a confidential physician issue to bring to it. The MEC went into executive session and Johnson presented the concerns about Knatt that the nurses had reported. The next day, Fonte and Johnson met with some of the nurses who were the source of the complaints about Knatt so Fonte could hear them directly. Fonte reported back to Medina and Rathbone and they agreed, under the MEC bylaws, to summarily suspend Knatt's privileges at Lane. Their decision was issued in a letter to Knatt. They asked Knatt to voluntarily submit himself for an evaluation by the Physician's Health Program of the Louisiana State Board of Medical Examiners. The letter noted that Knatt had the right to request a hearing in writing within seven days. Knatt hired an attorney and requested a hearing, which was scheduled for May 22, 2002. The hearing was later cancelled by Knatt's counsel because of a conflict. Knatt, upon his request, was also provided with documents concerning the basis of the peer review action.

On May 30, 2002, Knatt agreed to a compromise. The MEC withdrew the suspension, which had been in place for 21 days, and replaced it with a separate peer review action in the form of a "letter of reprimand." Knatt agreed to the language of the letter of reprimand, which addressed performing surgery after dental treatments as well as other complaints by nurses about Knatt's behavior,

including anger, cursing, pushing or shoving hospital staff, not timely reporting and starting scheduled surgeries, and utilizing support personnel who lacked permission to practice at Lane.

Knatt apparently became unsatisfied with this resolution, and a second appeal hearing was scheduled in October 2002. Prior to the hearing date, Knatt and the MEC agreed to another compromise, under which the letter of reprimand stood, but the MEC retroactively voided the summary suspension. As part of this compromise, Knatt agreed not to sue the MEC members.

Knatt did not consider the matter resolved. In May, 2003 he filed suit in Louisiana state court against the three MEC members, as well as Lane, Lane's CEO, CFO, and CNO, nine individual nurses, Dr. Ronnie Mathews, and the individual members of the Lane Board of Commissioners. The allegations included breach of contract, tortious interference with contract, unfair trade practices, defamation, and race discrimination. Defendants removed the action to the district court, where Knatt unsuccessfully moved to amend to add additional claims and defendants. The denial of one motion to amend is before the court on this appeal, and is discussed below. In a previous appeal, we affirmed the dismissal of another set of new claims.[3] The present appeal concerns claims asserted in the original state court petition.

Knatt asserts that the summary suspension was a sham and part of a larger conspiracy to ruin his practice. Among the evidence in a voluminous record, he put forth evidence that several months before the suspension, the hospital formed a committee consisting of doctors (who Knatt claims would be

---

[3] Knatt attempted to amend to allege a conspiracy to destroy his business by constructively evicting him from office space he leased from Lane. The district court denied the motion to amend and Knatt instead filed a separate lawsuit, alleging breach of contract, wrongful eviction, unfair trade practices, and discrimination, which the court consolidated with this case. All claims in the second suit were dismissed and appealed to this court, which affirmed the district court on bases that do not affect the resolution of the present appeal. *See Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Parish*, 289 F. App'x 22 (5th Cir. 2008).

harmed by Howell Place) to investigate Knatt for "on call incidents." There is testimony that, while hospital staff were not asked to lie, they were told to place Knatt under a microscope and report even minor infractions. Fonte, who led the investigation, is a competing orthopedic surgeon, and the hospital admitted to Knatt that it would be hurt by the Howell Place project. Jeanne Partin, Fonte's sister, played a role in assigning nurses to monitor Knatt and bring complaints to the attention of the administration. The summary suspension immediately followed a confrontation between Knatt and Partin in the operating room during one of Knatt's surgeries on May 7, 2002.[4] Knatt argues that the incidents that led to the summary suspension did not affect patient care, and that the real reason for the suspension was a conspiracy against him among Fonte, Partin, and the other defendants, based on unfair competition and race.

In a series of decisions, the district court dismissed all of Knatt's claims except three state law contract and tortious interference claims, which it remanded to state court. In the last of its orders dismissing Knatt's claims, the district court expressed frustration with the advocacy on behalf of Knatt:

> At the outset, this court notes that it was extremely generous in deviating from the local rules by granting Plaintiff's numerous motions for leave to file excess pages and for extension of time to file opposition. In considering the Plaintiff's arguments, the court was not helped by an 87-page opposition in which claims were not specifically addressed or directly presented. Quoting pages of the Magistrate Judge's Report did not serve to advance Plaintiff's arguments with respect to the issues before this court. Additionally, despite of [sic] all of the extensions granted, Plaintiff's arguments lacked conclusions, expressed incomplete thoughts, and in one instance a blank needed filling in. Plaintiff's counsel is admonished to carefully proofread, edit, and complete future memoranda submitted to this court.

---

[4] Knatt asked that a particular physician assistant be called to assist him in the procedure. Partin refused to call the physician assistant because she said he did not have privileges at Lane, and a heated discussion ensued.

6

These comments reflect a general pattern of a disjointedness in the presentation of Knatt's claims. His papers have been rich in conspiratorial narrative, but frequently fail to explain how the alleged facts satisfy the requirements of applicable law for the various claims.

Knatt now appeals the dismissal of his claims, and defendants appeal the remand of the remaining state law claims to the state court.[5]

## DISCUSSION

A. Questions Decided Unanimously

We begin with a discussion of issues on appeal upon which the court unanimously agrees.

*1. Motion to Amend*

Knatt argues first that the district court abused its discretion in denying his first motion to amend. This court reviews a district court's ruling on a motion to amend for abuse of discretion. *Cambridge Toxicology Group, Inc. v. Exnicios*, 495 F.3d 169, 177 (5th Cir. 2007). In deciding whether to allow an amendment under Federal Rule of Civil Procedure 15(a), a district court may consider factors such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment. *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 608 (5th Cir. 1998).

---

[5] Knatt's briefing on appeal suffers from problems similar to those discussed by the district court. His brief includes no genuine statement of the issues, *see* FED R. APP. P. 28(a)(5), attempts to incorporate by reference entire pleadings filed below, fails to provide consistent, appropriate citations to the appellate record (as opposed to the trial docket), and repeatedly cites evidence and authority without grounding the discussion in the precedents applicable to the particular claims under review. We do not mention these issues—some of which would be minor concerns in isolation—to single out Knatt's counsel. Unfortunately, we receive many briefs with one or more of these problems. We consider it useful to set out of this background, however, because the degree to which Knatt adequately presents certain arguments is a matter of disagreement between this opinion and the dissent.

The first claim sought to be added by Knatt in his amended petition involved an allegation that Matthews (a previously named defendant) had suggested to employees of another hospital that Knatt was impaired and had problems at Lane. This exchange between Matthews and employees of the other hospital allegedly occurred when Matthews inquired about Knatt's conduct when he practiced at that hospital. The incidents occurred before Knatt filed his original complaint and he offers no explanation for omitting this claim in his original petition. The district court did not abuse its discretion in refusing this amendment.

The second claim relates to events that occurred after the filing of the lawsuit and alleges that Matthews told another doctor that Knatt showed up late for surgeries and that disciplinary actions had been taken against him. The district court concluded that this allegation was being added solely to prevent dismissal on the basis that the support for the allegation was an unsworn statement from the physician who heard Matthews' comments. Denying the motion to amend was proper because the amendment would be futile. If the allegation is true, Matthews was merely repeating allegations that had already been made public by the filing of Knatt's suit. These allegations cannot support any claim against Matthews.

The final claim Knatt sought to add was that Richard Sessoms, a Lane Board member who was not a named defendant, brought a malicious complaint against Knatt that falsely accused Knatt of inadequate patient care. Knatt's motion in support of the amendment states that Sessoms brought the complaint as a board member to the board of directors. The board investigated the claim and no action was taken against Knatt. Knatt does not explain how these facts, if proven, would support any type of claim. The district court did not abuse its discretion in denying Knatt's motion.

2. *Statute of limitations*

Knatt argues next that the district court erred in dismissing defendant Matthews on the basis of prescription. As noted by the district court, all of the allegations in Knatt's petition that refer to Matthews concern events that occurred more than one year before the lawsuit was filed. There is no dispute that one year is the applicable prescriptive period. Knatt argues that because he alleges a conspiracy including Matthews, acts extending beyond the prescriptive period are actionable. This argument has no merit on the facts of this case. Under Louisiana Civil Code Article 2324(C), prescription is interrupted against all joint tortfeasors by the filing of a timely lawsuit against one joint tortfeasor. This provision works prospectively only, by tolling prescription against even unnamed joint tortfeasors. Article 2324(C) does not, however, revive a prescribed claim against a joint tortfeasor by filing a timely claim against another joint tortfeasor.

*3. Summary Judgment for Drs. Rathbone, Medina, and Fonte*

Knatt's next issue on appeal concerns the district court's decision to grant the motion for reconsideration of Rathbone, Medina, and Fonte on their motion for summary judgment. As a result of the ruling on the motion for reconsideration, the district court granted their motion for summary judgment. The basis for the motion was that Knatt had compromised his claims against them as members of the MEC and agreed, as part of that compromise, not to sue these doctors "with respect to the issuance of the summary suspension." The district court limited the ruling to grant summary judgment "only to the extent that plaintiff now attempts to assert a claim against these defendants 'with respect to issuance of the summary suspension.'" Knatt argues that the ruling is in error because there was no meeting of the minds on the meaning of "issuance," because he did not agree not to sue the defendants for failure to maintain the confidentiality of the peer review process and because the defendants' fraud against him based on their alleged roles in the conspiracy

vitiated the compromise. These arguments are without merit. Knatt was represented by counsel throughout the suspension process and the district court restricted the judgment to the plain language of the compromise agreement and the three defendants protected by that agreement.

### 4. LUTPA

Knatt also appeals the dismissal of his claims under LUTPA against the individual defendants and Lane. He alleged that the defendants conspired to prevent him from providing services in his medical practice outside of a conventional hospital setting by destroying his reputation in the Zachary community and interfering with his plans to move his practice to Howell Place. LUTPA declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. § 51:1405(A). Trade or commerce is defined in the statute as "the advertising, offering for sale, sale, or distribution of any services and any property, corporeal or incorporeal, immovable or movable, and any other article, commodity, or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of the state." LA. REV. STAT. § 51:1402(9).

The district court first found that Knatt lacked standing to bring a LUTPA claim against any defendants except Lane and Fonte. To have standing to bring a private action under LUTPA, the plaintiff must be a direct consumer or business competitor of the defendant. *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 405 (5th Cir. 2000); *Gardes Directional Drilling v. U.S. Turnkey Exploration Co.*, 98 F.3d 860, 868 (5th Cir. 1996). Knatt argues that all of the other defendants were co-conspirators with Fonte and Lane, and that he has standing to sue them pursuant to Louisiana Civil Code Article 2324(A), which states that "He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the

damage caused by such act." Louisiana courts are split over whether co-conspirators may be sued under LUTPA. *Compare Vermilion Hosp., Inc. v. Patout*, 906 So. 2d 688, 692 (La. App. 3d Cir. 2005) (now allowing conspirators to be sued), *with Strahan v. State*, 645 So. 2d 1162, 1165 (La. App. 1st Cir. 1994) (holding that the State, a non-competitor, could be sued for conspiring with a competitor) *and S. Tool & Supply, Inc. v. Beerman Precision, Inc.*, 862 So. 2d 271, 276 (La. App. 4th Cir. 2003) (finding that a supplier was liable to a distributor for "acting in concert" with two other distributors). The application of LUTPA to all of the defendants—including Lane and Fonte—presents difficult issues of state law. As we uphold summary judgment on all of Knatt's federal claims, only state law claims remain. We therefore vacate the district court's dismissal of Knatt's LUTPA claims and remand for reconsideration to determine if, in comity, the district court should decline to exercise jurisdiction over these claims.

### 5. *Defamation*

The district court also dismissed Knatt's claims for defamation against various defendants.[6] To state a claim for defamation, the plaintiff must establish (1) defamatory words, (2) publication, (3) falsity, (4) malice, actual or implied, and (5) resulting injury. *Cangelosi v. Schwegmann Bros. Giant Super Mkts.*, 390 So. 2d 196, 198 (La. 1980) (citations omitted).

The district court dismissed the defamation claims against various nurses for lack of publication because Knatt's complaint only alleges statements by the nurses to other hospital personnel related to their work. Statements made between employees in the course and scope of their employment are not

---

[6] The issue was presented to the district court in a Motion to Dismiss Certain Claims or, in the Alternative for Partial Summary Judgment filed by the defendants. Because Knatt submitted affidavits and other evidence to the court, which was not excluded, the motion is treated as one for summary judgment. *See* FED. R. CIV. P. 12(d).

statements communicated or publicized to third persons so as to constitute publication for a defamation claim. *Doe v. Grant*, 839 So. 2d 408, 416 (La. App. 4th Cir. 2003). The defamation claim against Lane was dismissed for lack of an allegation that Lane acted to deter patients and medical professionals from associating with Knatt by means of defamatory statements. The defamation claim against Fonte was dismissed based on prescription because the statement Fonte was alleged to have made took place more than one year before suit was filed.

Knatt argues generally that several affidavits he submitted in support of his opposition memo establish material issues of fact regarding the defamatory nature of the statements about him. After careful review, we conclude that this evidence cannot support a defamation claim against any of the defendants. It does not identify a speaker, a false statement, or the context in which the statement was made. Rather, it establishes only that there was general talk among a number of persons about Knatt's suspension and the reason for it.

Knatt also argues that Lane published Knatt's suspension. The vague anonymous reference in the MEC's minutes that "a physician" was referred to the Physicians Health Program is not actionable because the statement does not identify Knatt as the "physician" and because it is true. Knatt also takes offense at responses sent by Lane to hospitals seeking credential information about Knatt. A response sent by Lane states no disciplinary action had been imposed against Knatt with a parenthetical disclaimer "(exceeding 30 days)." Knatt reads the statement as stating that he has not been subject to disciplinary action in the last 30 days. That is not an accurate interpretation of the letter. The letter clearly states that Knatt has not been subject to disciplinary action that exceeded 30 days. The contents of the letter are also true and cannot support a defamation claim.

In summary, the district court did not err in dismissing Knatt's defamation claims.

### 6. Motion for Certification

Knatt argues that the district court abused its discretion in denying his motion for certification under Federal Rule of Civil Procedure 54(b) after most of his claims were dismissed before discovery commenced. He recognizes that the court has great latitude on this issue and we find that there was no abuse of discretion.

## B. Section 1983 and 1985 Claims

While we have unanimously agreed on the outcome of the issues discussed above, the dissent takes issue with the court's disposition of two final claims. We provide a more detailed discussion of these issues, in order to address the concerns of the dissent.

### 1. Section 1983

Knatt contends that the conspiracy to ruin his practice and subject him to a "sham peer review" after he announced his involvement in Howell Place also included race discrimination actionable under 42 U.S.C. § 1983. Knatt testified that the defendants treated him differently because of his race from the beginning of his association with Lane,[7] but that, as summarized in his brief, "after Lane declined participation with Dr. Knatt in the Howell Place project, a pattern and practice of harassment and discrimination, [sic] escalated and peer review activity and unfair trade practices were initiated . . . against Dr. Knatt." The district court dismissed Knatt's claim under 42 U.S.C. § 1983 on a motion for summary judgment. We review a grant of summary judgment *de novo. Paul v. Landsafe Flood Determination, Inc.*, 550 F.3d 511, 513 (5th Cir. 2008). Summary judgment is appropriate only where there are no genuine issues of

---

[7] For example, he claims this included "doctors wanting to send him all of the indigent and Medicaid patients."

material fact and the moving party is entitled to judgment as a matter of law. *Id.* We view facts and inferences in the light most favorable to Knatt. *Id.*

The summary judgment test for discrimination claims under § 1983 is the same as the test for discrimination claims under Title VII. *See Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 342 (5th Cir. 2002). A plaintiff may use either direct or circumstantial evidence to prove a case of intentional discrimination, though "[b]ecause direct evidence is rare, a plaintiff ordinarily uses circumstantial evidence to meet the test set out in *McDonnell Douglas.*" *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994). Analysis under the well-established *McDonnell Douglas* framework proceeds as follows: (1) the plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the employment action; and if that burden is satisfied, (3) the plaintiff must offer evidence that the proffered reason is a pretext for racial discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). The district court evaluated Knatt's discrimination claims under *McDonnell Douglas*, and Knatt briefs them on appeal within that framework.[8]

We agree with the district court—and the dissent appears to as well—that Knatt failed to establish a prima facie case sufficient to survive summary judgment under the *McDonnell Douglas* standard. To establish a prima facie case, Knatt must show that: (1) he is a member of a protected class, (2) he was qualified for staff privileges, (3) he suffered an adverse employment action, and

---

[8] Knatt's arguments regarding race discrimination are at times, to quote the district court, "difficult . . . to discern." Nonetheless, it is clear that the legal framework guiding his arguments is the *McDonnell Douglas* framework applied below. He states that "[c]laims brought pursuant to 42 U.S.C. § 1983 require analysis under a burden shifting analysis," citing case law applying *McDonnell Douglas,* and devotes nine pages to discussing the "others similarly situated" element of the prima facie case, which we consider to be the determinative element in the analysis.

(4) others similarly situated were more favorably treated. *See Rutherford v. Harris County*, 197 F.3d 173, 184 (5th Cir. 1999). There is no dispute that Knatt satisfies the first two requirements, and we presume that the 21 day summary suspension constituted an adverse employment action.[9] We agree with the district court, however, that Knatt failed to show that others similarly situated were more favorably treated.

"[I]n order for a plaintiff to show disparate treatment, [he] must demonstrate that the misconduct for which [he] was discharged was nearly identical to that engaged in by an employee not within [his] protected class whom the [hospital] retained." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) (internal quotation marks and alteration omitted). "[T]he conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Id.*

Knatt provides evidence of five white doctors who he alleges were more favorably treated. In only one of those cases, however, was the doctor impaired while in the operating room, and that doctor was also suspended. The alleged doctors were:

1) Demerol Dr.—This doctor stole Demerol from the emergency room and was allowed to resign; there are no allegations that he operated while under the influence of the drug.

2) Pneumothoraxes Dr.—This doctor performed an operation badly, causing the patient's lung to collapse. This event allegedly occurred almost 20 years ago, and concerned a doctor performing an operation incorrectly, not performing while impaired.

---

[9] The district court held there was no adverse employment action, because only the summary suspension qualified, and Knatt had agreed not to sue the individuals who made that decision. We do not decide whether this analysis was correct, because we find the prima facie case deficient on other grounds.

3)    Unknown Dr.—Fonte testified that there was at one point a doctor who was acting strangely in the operating room and that he was suspended from performing operations.

4)    Dr. RD—This doctor failed to show up to work and there are allegations of a car accident and drug abuse. He failed to meet with any of the doctors who contacted him, and was summarily suspended. Again, there is no question of impairment during surgery, and this doctor was in fact summarily suspended.

5)    Dr. WM—This doctor inserted a subclavian in an unprofessional manner, ignoring proper technique. There are no allegations that he was impaired when he performed the operation.

With this evidence, Knatt has not identified a case where a white doctor was impaired in the operating room and was not suspended. In fact, some of these cases demonstrate that when doctors at Lane were impaired, they were suspended. Knatt has failed to establish a prima facie case of disparate treatment, and we need go no further under the *McDonnell Douglas* framework.

The dissent suggests, however, that Knatt should survive summary judgment on the theory that he presented sufficient *direct* evidence of actionable race discrimination to survive summary judgment without satisfying *McDonnell Douglas*. We consider this an inappropriate basis to decide the case, because Knatt presents no such argument.

It is our general policy to treat litigants as masters of their own legal theories, and to require that they adequately present an issue or theory before we will consider it. A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it. *United States v. Skilling*, 554 F.3d 529, 568 n.63 (5th Cir. Jan. 6, 2009) (citing *United States v. Lindell*, 881 F.2d 1313, 1325 (5th Cir. 1989)). It is not enough to merely mention or allude to a legal theory. *See, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 325 n.12 (5th Cir. 2008) ("McIntosh occasionally mentions an 'equal protection' claim in conjunction with his due process claim, but this claim is inadequately briefed

and is hence waived."). We have often stated that a party must "press" its claims. *See, e.g.*, *Davis v. Maggio*, 706 F.2d 568, 571 (5th Cir. 1983) ("Claims not pressed on appeal are deemed abandoned."). At the very least, this means clearly identifying a theory as a proposed basis for deciding the case—merely "intimat[ing]" an argument is not the same as "pressing" it. *Cf. FDIC. v. Mijalis*, 15 F.3d 1314, 1326–27 (5th Cir. 1994) ("If a litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court."). In addition, among other requirements to properly raise an argument, a party must ordinarily identify the relevant legal standards and "any relevant Fifth Circuit cases." *Skilling*, 554 F.3d at 568 n.63; *see also* FED. R. APP. P. 28(a)(9) (stating that briefs must include "contentions and the reasons for them, with citations to the authorities . . . on which the appellant relies."); *Coury v. Moss*, 529 F.3d 579, 587 (5th Cir. 2008) (deeming estoppel argument waived where defendants cited cases but failed to "explain how these cases constitute authority for their bare assertion that [plaintiff] is estopped to bring this litigation"). We look to an appellant's initial brief to determine the adequately asserted bases for relief. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its *initial* brief on appeal.").

In light of these standards, Knatt did not adequately present for our review a direct evidence discrimination theory. None of the sixteen discrimination-related headings in the Table of Contents to Knatt's brief (which doubles as his statement of issues) mentions direct evidence analysis. Knatt argues multiple elements of *McDonnell Douglas*, which was the basis on which the district court decided the case, but nowhere acknowledges direct evidence as an alternative to the *McDonnell Douglas* analysis.

Indeed, Knatt's discrimination arguments mention "direct . . . evidence" only once, under a heading addressing an element of the district court's

*McDonnell Douglas* analysis.[10] This section argues, with practically no authority to place the argument in legal context,[11] that the entire peer review process should be considered an adverse employment action. As the brief puts it, the adverse action was "not simply the summary suspension, but is a pattern and practice of conspired bad-faith activity clothed as peer-review to [sic] in an effort to have the defendants hide behind a shield of immunity and a defense to legitimate claims." It then argues that the peer-review process was motivated by racial animus, because Knatt presented testimony that certain doctors and nurses who contributed to it had employed racial epithets.[12] It is at this point that Knatt mentions direct evidence, stating that "[t]his case is plagued with direct and circumstantial evidence of racial animus being a motivating factor in the harassment, deception and discrimination that led to the sham peer-review."

Thus, Knatt recites the phrase "direct and circumstantial evidence" without acknowledging the difference between the two categories, and without citing any authority. He does not argue (1) that the district court should have applied a direct evidence standard rather than *McDonnell Douglas*, or (2) that his claim satisfies a direct evidence standard as set forth in relevant precedent. Finally, he uses the phrase in the context of a meritless argument criticizing the district court's *McDonnell Douglas* analysis. The entire peer review cannot be an adverse employment action, because "an adverse employment action consists of *ultimate employment decisions* such as hiring, granting leave, discharging,

---

[10] The heading reads: "(3) Whether the trial court erred in finding that the adverse action was the suspension as opposed to the bad faith 'sham' peer-review."

[11] At the outset of this section, Knatt does briefly reference the "hostile work environment" theory of discrimination. *See generally Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003). The district court held, however, that in the proceedings below Knatt abandoned his hostile work environment claims through inadequate briefing. Knatt fails to show that this ruling was erroneous.

[12] The defendants contest these allegations, but we interpret the record in the light most favorable to Knatt, and assume they are true.

promoting, and compensating." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (internal quotation omitted). In this context, Knatt's mention of the phrase "direct and circumstantial evidence" does not raise an adequately-briefed argument that Knatt can survive summary judgment because of direct evidence of discrimination. Because Knatt failed to adequately raise, argue, or brief any issue regarding the direct evidence method before us on appeal, he has waived any such argument.

Even assuming, *arguendo*, that it were appropriate to consider a direct evidence theory, the district court's grant of summary judgment on these claims would still be correct. Direct evidence is evidence which, on its face and without inference or presumption, shows that an improper criterion served as a basis for an adverse employment action. *See Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 416 (5th Cir. 2003). As espoused by the dissent, the direct evidence theory depends almost entirely on the deposition of Marlene Bucionne, a nurse terminated by Lane who at one point maintained a lawsuit against Lane with representation from Knatt's counsel.[13] She testified, vaguely and equivocally, that various nurses and doctors at Lane used the "N-word." Her testimony does not support a direct evidence theory of discrimination.

Our cases have recognized, and we repeat, that "the term 'nigger' is a universally recognized opprobrium, stigmatizing African-Americans because of their race." *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993); *see also Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005) ("[R]acial epithets undoubtably demonstrate racial animus.") There is no disagreement between the majority and dissent on this point. To establish illegal employment discrimination, however, it is not enough to present evidence that an employer or coworker used racial epithets at some point in the past.

---

[13] The dissent states this testimony provides merely the "most graphic" evidence in the midst of other "extensive" evidence, but only cites additional circumstantial evidence.

Under the established case law of this circuit, for comments in the workplace to serve as evidence of discrimination, they must be: (1) related to the protected class, (2) proximate in time, (3) made by an individual with authority, and (4) related to the employment decision. *Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 261 (5th Cir. 2007).

The dissent claims that "at least two of the three doctors on the MEC, Dr. Rathbone and Dr. Medina, used racial epithets in reference to Dr. Knatt at a meeting involving the investigation of Dr. Knatt." If this were correct, it would satisfy *Jenkins*. But Bucionne's deposition does not support this assertion, and does not otherwise support the conclusion that members of the MEC used the N-word in a manner that was proximate in time, and related to, the summary suspension decision. Knatt's counsel repeatedly sought to elicit testimony that the MEC members used the N-word in connection with Knatt's summary suspension, but Bucionne testified only that (1) she had heard the MEC members use the word at unspecified times, (2) other nurses had used the word to refer to Knatt (and in one case, his wife), and (3) on certain occasions during the summary suspension controversy numerous individuals used the word. When pressed for detail (by Knatt's attorney) on who exactly used the word in what context, Bucionne either changed the subject, changed her testimony, or related instances where nurses had used the word.

In particular, counsel tried to elicit testimony that the three members of the MEC used the N-word in a May 16, 2002 meeting with nurses, approximately a week after the suspension decision. Bucionne said she did not remember the meeting, and that "[y]ou will have to refresh my memory," but then said she recalled it when counsel informed her that others had testified about it. Bucionne initially stated that Rathbone and Medina used the N-word at the meeting, but then retreated from that testimony and ultimately testified

that she remembered literally nothing concerning the meeting. The discussion included the following exchange:

Q    . . . And what physicians do you say were using the nigger word constantly?

A    Dr. Rathbone.

Q    Anybody else?

A    Dr. Medina.

Q    Anybody else?

A    In that particular meeting?

Q    Well, I guess anywhere in the hospital.

A    Oh, anywhere. I could not begin to give you the string of names.

Q    So in this meeting on May 16, 2003, Dr. Rathbone and Dr. Medina used the word nigger?

A    I believe it was in the conference call that we all sat around, but afterwards, when we were leaving, the N word was used a lot.

Q    Who was using it a lot?

A    Pretty much everyone. At this time I didn't know this was going to blow into this. So when the N word was brought up, I didn't turn and say I am going to remember you said that word.

Q    In what context was it being used?

A    I just told you. They are going to bring in their own kind.

This last answer suggested that Bucionne had confused this meeting with lunchroom conversations, at an earlier unspecified time, regarding a different

black doctor, Dr. Lewis.[14] Counsel asked "maybe I am misunderstanding. I thought the meeting that you were meeting with was in connection with Dr. Knatt's suspension; is this some other meeting?" Bucionne did not clarify her answer, instead stating "There were numerous meetings that we had about Dr. Knatt." Counsel tried to return to the subject of the May 16 meeting several times thereafter, until Bucionne finally clarified that she remembered nothing at all about it:

> Q       . . . I only want to know about this meeting on May 16, with the three doctors. What do you know?
>
> A       Due to the traumatic experience I experienced at the end, right before my surgery, I don't recall anything.
>
> Q       What traumatic experience did you have?
>
> A       I was having a vaginal hysterectomy, and I was very upset about this, and on women who have children, your children—once it was their home. As a female, it is pretty personal. I feared for my life. . . . I was fixing to go on leave, and then the phone rang and it was Ms. Partin, and she stated I no longer had a job, that they were downsizing. So I went to the hospital; my vitals were unstable. . . . So I think, because of all this trauma, I just don't recall a meeting.

These exchanges are typical of the indefiniteness and confusion that pervade the Bucionne deposition.

The only individuals with authority over the summary suspension were members of the MEC,[15] and Nurse Bucionne provided no specific comments and

---

[14] Bucionne previously testified that "when Dr. Lewis came into practice," nurse Karen Redmond had been "the ringleader of" lunchroom discussions speculating that black doctors would attract patients incapable of paying their medical bills.

[15] The dissent argues that we should consider racist comments made by hospital staff in determining whether the summary suspension was racially motivated. But it does not—and cannot—point to any cases where racist comments by co-workers or staff were evidence of racial discrimination by the employer. Our case law is very clear that for

no context for when and how the members of the MEC may have used racial epithets. She never alleges with sufficient particularity that any of those members used racial epithets in connection with the employment decision at issue, and none of the comments she discusses meet the *Jenkins* criteria.[16] Accordingly, her testimony would not allow Knatt to survive summary judgment on a direct evidence theory.

Knatt has failed to present evidence that would allow him to avoid the *McDonnell Douglas* framework—an argument he failed to brief—nor does he have sufficient evidence to survive summary judgment under that framework. We therefore affirm the district court's grant of summary judgment in favor of the defendants on the § 1983 claim.

*2. Section 1985(3)*

Section 1985(3) has unusual wording and a complex set of elements. *See generally Ernest v. Lowentritt*, 690 F.2d 1198, 1202 (5th Cir. 1982). Knatt alleges that the district court failed to consider his § 1985(3) claim using the correct standard of proof. But the only argument offered consists of the statement that "This issue is fully briefed in plaintiff's opposition . . . and incorporated herein as if copied in enxtenso [sic]," as well as citation to a single case that discusses not § 1985(3) but § 1983. We will not go searching through the record to find Knatt's arguments on this issue. Based on the principles

---

comments to serve as evidence of discrimination, they must be made by an individual with authority. *See Jenkins*, 478 F.3d at 261. These nurses were certainly not in a position of authority over Knatt.

[16] This case differs from *Jones v. Robinson Property Group*, where we noted that the testimony "cite[d] specific statements and, especially in light of the summary judgment standard, [the plaintiff] prove[d] with sufficient particularity when the statements were made and generally who made them." 427 F.3d at 993. We found that the "testimony clearly and explicitly indicate[d] that decision maker(s) . . . used race as a factor in employment decisions, which is by definition direct evidence of discrimination." *Id.* In contrast, no rational fact-finder could conclude that the MEC suspended Knatt on account of his race based on the testimony of Nurse Bucionne.

articulated above, Knatt has waived his § 1985(3) claim through inadequate briefing.

## C. Remand of remaining claims to state court

Finally, the defendants cross appeal the district court's decision to remand the remaining state law claims to Louisiana state court. Though we find no error or abuse of discretion in the district court's remand of these claims to state court, we vacate this decision and remand so that the district court may consider all of the state law claims together, including the remanded LUTPA claim.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed except as to the dismissal of Knatt's LUTPA claims and the remand of the remaining claims to state court. These decisions are vacated and the case is remanded to the district court for further proceedings consistent with this opinion.

AFFIRMED in part, VACATED in part, REMANDED.


DAVIS, Circuit Judge, dissenting:

I respectfully dissent from section B. of the majority opinion. In that section, the majority gives its reasons for affirming the district court's dismissal of Dr. Knatt's claims under § 1983 and § 1985(3) on summary judgment. The district court dismissed the § 1983 claims on the basis that Dr. Knatt failed to establish a prima facie case of discrimination under the *McDonnell Douglas* test. On both the § 1983 claim and the § 1985 claim, the district court concluded that Dr. Knatt did not establish that race played a part in his summary suspension.

The main question we have in this case is the usual one we face in summary judgment cases: whether the plaintiff produced sufficient evidence to raise a genuine issue of material fact on a key issue. In this case the key issue

is whether race played a role in the defendants' suspension of Dr. Knatt from practicing as a physician at Lane.

Dr. Knatt was entitled to raise genuine issues of fact on this issue in two ways. First, he could present direct evidence of discrimination. *Portis v. First Nat'l Bank*, 34 F.3d 325, 328 (5th Cir. 1994). Because Dr. Knatt's claims are employment related and in that context direct evidence of discrimination is rare, Dr. Knatt could alternatively use the standard set out in *McDonnell Douglas* to establish an inference of discrimination. *Id.* Contrary to the majority's description, the *McDonnell Douglas* approach is simply an additional, easier weapon a plaintiff has in his arsenal to prove the fact at issue: discrimination. The invocation of *McDonnell Douglas* does not supplant the traditional direct evidence method of proof. If the plaintiff can demonstrate the existence of a material fact tending to show discrimination either by direct evidence or through the method established by *McDonnell Douglas,* he can avoid summary judgment.

Therefore, when Knatt alleged and argued that race played a role in his employer's decision to suspend him, Knatt was entitled to prove this fact either by direct evidence or the *McDonnell Douglas* standard. Once the district court grants summary judgment, our task is to review that ruling de novo and consider "the record taken as a whole" drawing "all reasonable inferences in favor of the nonmoving party" and refrain from making credibility determinations or weighing of the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)(internal quotation marks and citations omitted).

This review includes consideration of whether a fact issue has been raised either under the *McDonnell Douglas* standard or the traditional direct evidence method of proof. For example in *Jatoi v. Hurst-Euless-Bedford Hospital Authority*, although the plaintiff failed to meet all four criteria of the *McDonnell*

*Douglas* test, this court went on to examine the summary judgment record as a whole to determine if summary judgment was appropriate.

> While proof of all four of the *McDonnell Douglas* criteria will establish a circumstantial prima facie case, such proof is not the exclusive means of establishing a plaintiff's preliminary burdens. In *Byrd v. Roadway Express, Inc.*, 687 F.2d 85, 86 (5th Cir.1982) the plaintiff established the first three criteria but could not establish the fourth because his position had been filled by another minority. As we stated in *Byrd*, "the focus of the inquiry may not be obscured by the blindered recitation of a litany." 687 F.2d at 86. If a plaintiff cannot establish some or all of the <u>*McDonnell Douglas* steps, the district court must examine all the evidence that has been adduced for other indicia of racial discrimination relating to his discharge and determine whether it is more likely than not that the employer's actions were based on illegal discriminatory criteria.</u> *Id.*

*Jatoi v. Hurst-Euless-Bedford Hospital Authority*, 807 F.2d 1214, 1219 (5th Cir. Tex. 1987)(emphasis added).

Racial animus, like any other fact, can be established by direct or circumstantial evidence. For example, in *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 195 (5th Cir. Tex. 2001), to determine whether the district court erred in granting summary judgment in favor of defendants on the element of causation, this court reviewed Fierros' direct evidence of a statement her supervisor made to her that she had been denied a pay increase because she had filed a discrimination claim against him. It also considered the circumstantial evidence that supported the finding that discriminatory motive was present.

> The summary judgment record includes an affidavit in which Fierros states that Arnold told her that she had been denied the pay increase because she filed a discrimination complaint against him. Such an affidavit is direct evidence that Arnold had a retaliatory motive because it "is evidence which, if believed, proves the fact [of intentional retaliation] without inference or presumption."
> . . .
> Our determination that Fierros has raised a jury question about whether Arnold intended to retaliate against her when he denied

her the merit pay increase is further supported by circumstantial evidence.

*Id.*

Thus, this court can look at all evidence in the record, both direct and circumstantial, to determine if Dr. Knatt has raised a genuine issue of material fact for trial. Dr. Knatt argued both in the district court and in this court that he was entitled to defeat the summary judgment motion based on the direct and circumstantial evidence which he described in his brief. Two full pages of Dr. Knatt's brief are dedicated to a discussion of evidence of racial animus and how that evidence establishes discrimination. The remainder of the circumstantial evidence is discussed throughout his brief. Despite the fact that this is Dr. Knatt's central argument in this appeal, the majority concludes that this issue is inadequately briefed to preserve the argument on appeal. Apparently the majority would require Knatt to tag each item of evidence as either supporting his argument of discrimination under the *McDonnell Douglas* standard or his argument of discrimination based on direct and circumstantial evidence. Such a requirement makes no sense. If a plaintiff can raise a genuine issue of material fact tending to show discrimination, the defendant's motion for summary judgment must be denied.

Dr. Knatt complains of a conspiracy at the hands of the defendants that began before his suspension. Beginning in October 2001, an Ad Hoc Committee was appointed by the Executive Bylaws Committee of the Board of Lane Memorial to single out Dr. Knatt to review complaints about him, particularly any on-call incidents. The review lasted until January 2002. According to the deposition testimony of Dr. Rathbone and Dr. Fonte, the Board has never appointed a committee to investigate a hospital physician for on-call violations except Dr. Knatt.

The most graphic evidence of racial animus was provided by surgical nurse Marlene Bucionne. She testified that the nurses were ordered by Jeanne Partin (nurse supervisor and sister of orthopedic surgeon Dr. Fonte), Dr. Fonte and Terry Whittington, CEO, to monitor Dr. Knatt's activities closely and document anything they could find on which to base a reprimand. This documentation was to be delivered to hospital officials and administration. Dr. Knatt argues that this supports his argument that hospital officials were looking for a reason to get rid of him and supports his statements that the complaints by the nurses of Dr. Knatt's behavior in surgery were false or exaggerated. Lane Memorial Board Member Etta Hearn wrote to CEO Whittington complaining of the baseless complaints about Dr. Knatt by the nurses in March 2002. Dr. Knatt testified that the complaints of the nurses in general and those that led to his suspension were false or overstated. He also provided evidence that similar complaints about other doctors, including Dr. Fonte, were not acted upon.

The extensive evidence presented by Dr. Knatt supports an inference that Dr. Knatt was being targeted for mistreatment and more intense scrutiny than other doctors because of his race. Nurse Bucionne's testimony went directly to the defendants' racial animus. She testified in her deposition that at least two of the three doctors on the MEC, Dr. Rathbone and Dr. Medina, used racial epithets in reference to Dr. Knatt at a meeting involving the investigation of Dr. Knatt. She also testified that she heard the third member of the MEC, Dr. Fonte, using racial epithets several times but did not provide the context for those comments. These are the same doctors who ordered Dr. Knatt's suspension. Although her testimony is not entirely clear, the hospital CEO, Jeanne Partin and other nurses on the operating staff were part of that meeting and also used racial epithets in relation to Dr. Knatt. These are the same nurses who brought the complaints that were used to support Dr. Knatt's suspension.

This direct evidence raised an issue of fact that racial animus played a role

in the suspension of Dr. Knatt. The statements refer to race; they were made by the members of the MEC who ordered Dr. Knatt's suspension, i.e. the applicable decision makers; and they were related to the decision process because they occurred in a meeting at which the nurses were directed to gather evidence which was used as a basis for the suspension. *Patel v. Midland Mem. Hosp. & Med. Ctr.*, 298 F.3d 333, 343-44 (5th Cir. 2002). The use of racial epithets by the nursing staff who submitted the evidence on which the suspension was based is also relevant.

Use of racial epithets in an employment context is direct evidence of discrimination sufficient to defeat summary judgment. In *Brown v. East Miss. Elec. Power Ass'n*, the plaintiff presented evidence that his supervisor used racial epithets both generally and in reference to him. We said -

> Unlike certain age-related comments which we have found too vague to constitute evidence of discrimination, the term "nigger" is a universally recognized opprobrium, stigmatizing African-Americans because of their race.

*Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. Miss. 1993)(footnote omitted). See also footnote 8 of that case, listing cases dealing with use of this racial epithet as direct evidence of discrimination.

> See *Kendall v. Block*, supra (calling an employee "nigger" may be direct evidence of discrimination); *EEOC v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir.1990) (general manager's statement that if it were his company he would not hire blacks is direct evidence of discriminatory animus in failing to promote the plaintiff); *Brewer v. Muscle Shoals Bd. of Educ.*, 790 F.2d 1515 (11th Cir.1986) (school superintendent's comment that he did not want to appoint plaintiff to an administrative position because he did not want to see the school system "nigger-rigged" is direct evidence of discriminatory animus, even though the comment was made with regard to an incident occurring after the alleged violation); *Bibbs v. Block*, 778 F.2d 1318 (8th Cir.1985) (en banc ) (selection committee member's characterization of plaintiff as a "black militant" and reference to another black employee as "nigger" was direct evidence of

discrimination in failure to promote), overruled on other grounds by *Price Waterhouse*, supra.

*Id*. at 862.

> The most obvious way of showing an unlawful employment practice is to offer "evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents . . ." [citing *Troupe v. May Department Stores Company*, 20 F.3d 734 (7th Cir. 1994)] Examples include epithets or slurs uttered by an authorized agent of the employer . . . . When produced, such "direct" evidence will without more ordinarily suffice to show that an adverse employment condition, or limitation on an employment opportunity, was imposed "because of" the plaintiff's protected group characteristic.

*Civil Rights and Employment Discrimination Law*, Harold S. Lewis, Jr. (West 1997), § 4.2.

The direct and circumstantial evidence of discrimination set forth above creates a genuine issue of fact on the question whether the defendants conspired to find a reason–pretextual or otherwise--to get rid of Dr. Knatt and that racial animus played a role in Dr. Knatt's suspension. For this reason I would vacate the dismissal of Dr. Knatt's § 1983 and § 1985 claims and remand this case to the district court for trial.